USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  May 8, 2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                                 :

MICROBAN PRODUCTS CO.,              :

                                 :

                     Plaintiff,    :        14 Civ. 41 (KPF)

                                 :

          v.                     :        OPINION AND ORDER

                                 :

API INDUSTRIES, INC., d/b/a ALUF PLASTICS,  :
INC.,                            

                                 :

                   Defendant.  :

                                 :
------------------------------------------------------------X

KATHERINE POLK FAILLA, District Judge:

      For seven years, the parties to this litigation had a business arrangement by which Defendant Aluf Plastics manufactured special trash bags using antimicrobial compounds it purchased from Plaintiff Microban Products, and then used the Microban name and trademarks to co-brand and market those trash bags. Unfortunately, over the past 12 months, the relationship has soured — in no small part because Aluf purchased and took possession of over 100,000 pounds of antimicrobial compounds from Microban, but refused to pay for those materials unless and until its licensing agreement with Microban, which expired by its terms in the summer of 2013, was extended indefinitely.

      Microban seeks two things in this litigation: the money it is owed from Aluf and control over its trademarks. In lieu of moving for a preliminary injunction, Microban now moves for summary judgment on its claims for trademark infringement, trademark dilution, unfair competition, goods sold and delivered, account stated, and breach of contract under New York State law;

and for trademark infringement under the Lanham Act, 15 U.S.C. §§ 1114(1)(a),
1125(a)(1); it also moves for a permanent injunction barring Aluf from
improperly using the Microban marks to co-brand Aluf's trash bags.  For the
reasons discussed below, Microban's motion for summary judgment is granted,
as is its motion for a permanent injunction.

## BACKGROUND[1]

### A.    Factual Background

### 1.    The Parties

Microban Products Company ("Microban" or "Plaintiff") is a North
Carolina corporation with its principal place of business in Huntersville, North
Carolina.  (Compl. ¶ 1).  Among its other businesses, Microban develops,
manufactures, and sells proprietary antibacterial, antifungal, and antiviral
chemical additives (the "Microban Compounds").  (Pl. 56.1 ¶ 1).  API Industries,
Inc., doing business as Aluf Plastics, Inc. ("Aluf" or Defendant"), is a New Jersey

---

[1]    The facts stated herein are drawn from Plaintiff's 56.1 Statement ("Pl. 56.1"), and
Defendant's responses thereto ("Def. 56.1 Response"); Defendant's 56.1
Counterstatement ("Def. 56.1"), and Plaintiff's responses thereto ("Pl. 56.1 Response");
the Declaration of Steven Kreps and the exhibits attached thereto ("Kreps Decl."); the
Declaration of Susan Rosenberg ("Rosenberg Decl."); and the Declaration of Martin
Ayrovainen and the exhibits attached thereto ("Ayrovainen Decl.").  For convenience,
Plaintiff's opening brief will be referred to as "Pl. Br"; Defendant's opposition brief as
"Def. Opp."; and Plaintiff's reply brief as "Pl. Reply."

Citations to a party's 56.1 Statement incorporate by reference the documents cited
therein.  Where facts stated in a party's 56.1 Statement are supported by testimonial or
documentary evidence, and denied with only a conclusory statement by the other party,
the Court finds such facts to be true.  *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered
paragraph in the statement of material facts set forth in the statement required to be
served by the moving party will be deemed to be admitted for purposes of the motion
unless specifically controverted by a corresponding numbered paragraph in the
statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement
by the movant or opponent ... controverting any statement of material fact[] must be
followed by citation to evidence which would be admissible, set forth as required by Fed.
R. Civ. P. 56(c).").

corporation with its principal place of business in Orangeburg, New York.  (*Id.* at ¶ 15).  Aluf manufactures industrial liners and other plastic products for commercial and consumer use, including plastic trash bags.  (*Id.* at ¶ 16; Def. 56.1 ¶ 34).[2]

### 2.    Microban's Marks

Microban owns or holds various federally registered trademarks or service marks, as well as unregistered marks (taken together, the "Microban Marks"), related to the development, manufacture, and sale of the Microban Compounds. (Pl. 56.1 ¶ 1).  The Microban Compounds can be incorporated into various polymeric, textile, or other materials in order to imbue those materials with durable antimicrobial qualities; as relevant here, those qualities can prevent algae and other organisms from growing on plastic trash bags.  (*Id.* at ¶ 2).

---

[2]    The parties raise various evidentiary challenges to each other's submissions.  First, Aluf asks the Court to strike the Kreps Declaration because the allegations contained therein "are not based upon personal knowledge, do not set out facts that would be admissible in evidence, contain no details other than buzz words, and are precisely the type of statements that are not … admissible in evidence." (Def. Opp. 23 n.2).  The Court has reviewed the Kreps Declaration with care and has determined that it is admissible.

Next, Microban asks the Court to strike Aluf's 56.1 Response and 56.1 Counterstatement because Aluf (i) fails to provide correspondingly-numbered paragraph responses to Plaintiff's 56.1 Statement, and inexplicably begins numbering its own 56.1 Counterstatement at #32; (ii) only "haphazardly" cites to admissible evidence; and (iii) utilizes improper legal argument rather than admissible evidence.  (*See* Pl. 56.1 Response 1-2).  "A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules."  *Holtz* v. *Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (internal citations omitted).

While the Court agrees with Microban's characterizations of Aluf's 56.1 Response and Counterstatement, the Court is capable of determining which of the parties' statements are supported by admissible evidence, and will disregard those that are not.  Though the Second Circuit has made clear that a district court is "not required to consider what the parties fail to point out' in their Local Rule 56.1 statements, it may in its discretion opt to 'conduct an assiduous review of the record' even where one of the parties has failed to file such a statement."  *Holtz*, 258 F.3d at 73 (quoting *Monahan* v. *New York City Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000)).  The Court has done so, and will proceed to consider the substance of Microban's motion.

The Microban Marks at issue here, attached as Exhibit A to the
Declaration of Stephen Kreps, are valid and subsisting, unrevoked, uncanceled,
and incontestable.  (Kreps Decl. Ex. A; Pl. 56.1 ¶ 4).  Microban has used the
Microban Marks for over 15 years, and has invested millions of dollars in
creating, maintaining, and promoting the goodwill associated with the Marks.
(Pl. 56.1 ¶¶ 5-7).  As a result, Plaintiff avers, the Microban Marks are favorably
recognized and relied upon, within various industries and among the consumer
public, as indicating high quality antimicrobial goods and services.  (*Id.* at ¶ 8).

### 3.    Microban's Licensing Agreement with Aluf

Microban regularly enters into licensing agreements with third parties
pursuant to which Microban grants exclusive or non-exclusive licenses to use
the Microban Marks as a co-brand in marketing or selling goods that
incorporate the Microban Compounds.  Indeed, Microban earns significant
revenue from this practice.  (Pl. 56.1 ¶¶ 10-11).

Of note here, on or about March 1, 2006, Microban[3] entered into a license
and supply agreement with Aluf (the "Agreement").  (Pl. 56.1 ¶ 17).  The
Agreement granted Aluf a "non-exclusive, non-transferable right and license to
use the [Microban] Trademark as a co-brand in the marketing and sale of the
Products" in Canada and the United States (the "Trademark License").  (*Id.* at
¶ 18).  Under the terms of the Agreement, Aluf agreed to purchase 75,000
pounds of a customized Microban Compound at a fixed price of $8.00 per
pound in "Agreement Years 1 through 3," and 100,000 pounds of the same in

---

[3]    Microban Canada Inc. ("MCI") was an original signatory to the Agreement; Microban
acquired MCI's interest in the Agreement in approximately 2011.  (Pl. 56.1 ¶ 19).

"Agreement Years 4 through 6" (the "Minimum Purchase Requirement"); Year 6

ended in 2013.  (*Id.* at ¶¶ 22-23).

The Minimum Purchase Requirement functioned as a "take or pay

provision," such that if Aluf did not meet the Minimum Purchase Requirement,

it was obligated to remit a discounted price as liquidated damages.  (Pl. 56.1

¶ 24).  Initially, the "take or pay" provision provided for a penalty comprising

100% of the Minimum Purchase Requirement.  (Compl. Ex. A § 10).  However,

in a subsequent amendment to the Agreement, the parties negotiated for a

penalty that comprised 62.5% of the Minimum Purchase Requirement.

(Rosenberg Decl. ¶ 13).[4]

The Agreement became exclusive as of April 1, 2007, and the Trademark

License contained therein was only valid during the term of the Agreement.  (Pl.

56.1 ¶¶ 20-21).  The Agreement terminated on June 30, 2013, after having been

extended three times.  (*Id.* at ¶¶ 22-23; Compl. Ex. A).  The Agreement did not

---

[4]     For this reason, Aluf's attempts to characterize the Agreement as a contract of
adhesion — by citing to the same declaration it uses later to demonstrate that the
parties agreed to an amendment *favorable to Aluf* — ring particularly hollow.  (*See* Def.
Opp. 2 ("The agreement in question … was a form used by Microban and not a
negotiated contract.")).  While Aluf's statement appears intended more as atmospherics
than actual legal argument, its allegation is a serious one that the Court must treat as
such.  "A court will find adhesion only when the party seeking to rescind the contract
establishes that the other party used 'high pressure tactics,' or 'deceptive language,' or
that the contract is unconscionable."  *Klos* v. *Lotnicze*, 133 F.3d 164, 168 (2d Cir. 1997)
(internal citation omitted).  "Typical contracts of adhesion are standard-form contracts
offered by large, economically powerful corporations to unrepresented, uneducated, and
needy individuals on a take-it-or-leave-it basis, with no opportunity to change the
contract's terms."  *Id.*  Aluf has neither moved to rescind the Agreement, nor put forth
any evidence demonstrating that Microban utilized "high-pressure" or "deceptive" tactics
to coerce Aluf into signing the Agreement.  More importantly, there is absolutely no
evidence that Aluf is in any way unrepresented or unsophisticated; in fact, the record
indicates the exact opposite.  Accordingly, the Court disregards this argument.

provide for a sell-off period for Aluf's existing inventory, nor for any right for Aluf to use the Microban Marks after the Agreement terminated.

### 4.   The Parties' Business Arrangement

Per the practices established by the Agreement, Aluf would provide Microban with the base resin, which Microban would combine with various antimicrobial chemicals to make the finished Microban Compound, which would then be returned to Aluf in the form of pellets.  (Pl. 56.1 ¶ 25; Def. 56.1 ¶ 37).  Aluf then incorporated the Microban Compound into garbage bags for retail, commercial, health care and food service applications.  (Compl. Ex. A § 4).  Prior to the Agreement's expiration, Aluf used the Microban Marks as a co-brand in connection with the sale and promotion of Aluf's goods, including on Aluf's website, marketing materials, and product packaging.  (Pl. 56.1 ¶ 26).[5]

### 5.   Aluf's May 2013 Order

As the termination date of the Agreement approached in 2013, Aluf had not yet met the Minimum Purchase Requirement of Microban Compound for that year.  (Pl. 56.1 ¶ 27).  In fact, Aluf already had Microban Compound in its inventory at the beginning of 2013.  (Def. 56.1 ¶ 44; Pl. 56.1 Response ¶ 44).[6]

---

[5]      Aluf contends, and Microban does not seriously dispute, that Microban-branded antimicrobial trash bags are, generally speaking, more expensive than generic antimicrobial trash bags.  (Def. 56.1 ¶ 39; Pl. 56.1 Response ¶ 39).

[6]      Aluf alleges that "[i]n or about 2011, Microban explained to us that for some internal business reasons, it needed to increase its revenue before the end of 2011 and induced us to purchase an additional approximately 108,000 pounds of product at a reduced price."  (Rosenberg Decl. ¶11).  Aluf refers to this as "stuffing the pipeline."  (Def. Pre-Mot. Letter 1; Def. Opp. 2).  Significantly, however, Aluf does not offer any particularized allegations of bad faith or impropriety by Microban in connection with the offer or the sale.  In any event, Microban does not dispute that Aluf had product on hand at the time of its May 2013 purchase; anything beyond this is irrelevant to the resolution of the parties' arguments.

Nonetheless, Aluf elected to purchase the entire Minimum Purchase Requirement for that year, approximately 100,000 pounds, on May 31, 2013. (Pl. 56.1 ¶ 28).[7]

After Microban received the resin from Aluf, it manufactured the Microban Compound in four batches between June and July 2013.  (Pl. 56.1 ¶ 29).[8]  Each batch was invoiced when it was picked up by Aluf from Microban's compounding facility; the last batch was invoiced to Aluf on July 31, 2013.  (*Id.* at ¶¶ 29, 30, 32).[9]  The total invoiced amount was $800,876.  (*Id.* at ¶ 34).  Aluf remitted $50,000 on its invoice, but has not paid the remaining $750,876.  (*Id.* at ¶¶ 36-37).   At no time, however, has Aluf objected to the quality, quantity, or conformance of the Microban Compound it received.  (*Id.* at ¶ 35).

### 6.    The Termination of the Agreement and Subsequent Communications

The Agreement terminated on June 30, 2013, and has not since been renewed.  (Compl. Ex. A).  Despite Microban's efforts to the contrary, since June 30, 2013, including since the commencement of this action in January 2014,

---

[7]    The Agreement required Aluf to make payment in full within 30 days of delivery.  (Pl. Br. 9 n.9 (citing Compl. Ex. A § 2)).  The invoices also recited a late-payment penalty of 1.5% per month, to which Aluf did not object prior to the filing of this motion.  (Def. 56.1 ¶ 62; Pl. 56.1 Response ¶ 62; Pl. Reply 1 n.2).

[8]    Aluf repeatedly emphasizes that Microban did not deliver the last batches of Microban Compound after the Agreement terminated.  (*See, e.g.*, Def. 56.1 ¶ 45).  However, it is undisputed that (i) Aluf did not place its order until May 31, 2013, and (ii) Microban could not begin to manufacture the Microban Compound until it first received the resin to imbue with the Microban Compound.  (Pl. 56.1 Response ¶ 45).  There is no evidence in the record as to the specific dates that Aluf delivered the resin (and, by extension, the portion of blame that Aluf bears for the fact that the Microban Compounds were delivered and manufactured after the Agreement terminated).  Nonetheless, resolution of this issue is immaterial for the purposes of this Opinion.

[9]    To be precise, Microban delivered 100,109.5 pounds of the Microban Compound, due to the amount of resin provided by Aluf and the weight of the packaging containers.  (Pl. 56.1 ¶ 33).

Aluf has not changed the way it uses the Microban Marks as a co-brand on its website, marketing materials, or product packaging.  (Pl. 56.1 ¶¶ 38-39). Instead, Aluf has engaged in a campaign of extortion culminating in the instant lawsuit.

On September 17, 2013, Microban's Director of Business Development notified Aluf of its past-due payments.  (Pl. 56.1 ¶ 40).  The next day, Martin Ayrovainen, Aluf's Chief Financial Officer, promised to call a Microban representative; he did not dispute the amount owed, or the fact that Aluf's right to continue to use the Microban Marks had expired.  (*Id.* at ¶¶ 41-42). Specifically, Ayrovainen wrote:

> As you know, Aluf now literally has years' worth of Microban [product] and *I heard recently that our use of the Microban trademark does not come close to covering that same time frame.*  This is concerning to say the least.

(*Id.* ¶ 42 (emphasis added)).

Ayrovainen wrote several weeks later, on October 1, 2013, to inquire as to "how long [Aluf] could continue to use the [Microban Marks]," writing:

> [M]ight there be anything to report on the trademark use side?  The ability to market our products with the Microban trademark is important … I am concerned that Aluf's outside auditors will ask me to write down the value of our Microban inventory.  Not just because we have over a year of inventory, but also because generic antimicrobials seem to be much less expensive on a per-pound basis than the amount Aluf is being asked to pay for Microban.

(*Id.* at ¶ 43).[10]   Microban responded the next day by letter, stating:

> Aluf has no right to use the trademark after [June 30, 2013], and absent a new license, any such use is prohibited.  We specifically communicated this to Aluf during the negotiations this summer.  This is all completely irrelevant, however, to the issue at hand. Aluf is seriously in arrears on a balance of $750,876. Until this is paid in full, we cannot entertain any discussions of extending the trademark license.

(*Id.* at ¶ 44).

Steven Kreps, the Chief Financial Officer of Microban, wrote Ayrovainen on October 25, 2013, to demand that Aluf pay its arrearages and "cease and

---

[10]   Aluf contends that this e-mail is inadmissible as an offer in compromise pursuant to Federal Rule of Evidence 408, but, in the very next sentence, cites to that e-mail in support of its affirmative defense to Microban's breach of contract action.  (Def. Opp. 6 ("The references in paragraphs 42 and 43 in plaintiff's Rule 56.1 statement to settlement emails sent by Aluf's Chief Financial Officer violate the Federal Rules of Evidence, Rule 408 which prohibits any settlement materials from being used for any purpose other than settlement; this includes a motion for summary judgment.  *Those e-mails make it clear, however, that plaintiff was given notice pursuant to UCC § 2-717.*" (emphasis added))).

First, as Microban correctly notes, Aluf may not "use the email as a sword in one instance and use an evidentiary rule to shield its admissibility in another."  (Pl. Reply 9 n.16 (citing, *inter alia*, *United States* v. *Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991) (noting same principle in context of attorney-client privilege))).

Second, Aluf has failed to demonstrate that Rule 408 applies.  There is nothing in this e-mail to indicate that it was intended as an offer in compromise.  To the contrary, Ayrovainen's December 2013 e-mails explicitly state "this communication is written for settlement purposes only," while his October 2013 e-mails contain no such disclaimer. Ayrovainen's *post hoc* Declaration cannot change the unambiguous text of his e-mails. (*See* Ayrovainen Decl. ¶ 2 ("[Microban has] taken certain emails I sent for settlement purposes out of context."); *id.* at Ex. A; Kreps Decl. Ex. C).

More importantly, Rule 408 prohibits the use of settlement discussions to prove "the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction"; Microban does not seek to introduce this e-mail for those purposes. Fed. R. Evid. 408.  Instead, it is introduced, as discussed *infra*, as evidence of Aluf's willful infringement; and it is clearly admissible for that purpose.  *See, e.g., Lee Middleton Original Dolls, Inc.* v. *Seymour Mann, Inc.*, 299 F. Supp. 2d 892 (E.D. Wis. 2004) (refusing to exclude evidence regarding conversation between copyright infringement plaintiff's president and defendant's president after suit had been filed, offered by plaintiff as evidence that infringement was willful, where it was clear from conversation that plaintiff's president did not share defendant's president's willingness to discuss potential settlement).

desist from any further use of the Microban trademark and name, including on your website, marketing materials, and product packaging." (Pl. 56.1 ¶ 45). Aluf did no such thing. By November 8, 2013 letter to Aluf's outside counsel, Microban's outside counsel reiterated Kreps's demands for payment and for Aluf to cease its infringement of the Microban Marks. (*Id.* at ¶ 46). Again, Aluf did no such thing.

Aluf's position has remained constant: it will only pay for the Microban product it purchased if Microban agrees to extend the Trademark License, at no additional cost, for as long as it takes for Aluf to sell its inventory of trash bags. (Pl. 56.1 ¶ 53; Def. 56.1 ¶¶ 49-50). Aluf estimates that this could take up to three years. (Rosenberg Decl. ¶ 24). Conversely, Microban alleges that Aluf's continued use of the Microban Marks as a co-brand prevents it and its affiliates from granting new and/or exclusive licenses to any third party with respect to trash bags, and damages Microban's reputation and goodwill. (Pl. 56.1 ¶ 47).[11]

## B.   Procedural History

Microban initiated this action on January 6, 2014. (Dkt. #1). Plaintiff concomitantly moved for a temporary restraining order ("TRO"), seeking to restrain Aluf from further using the Microban Marks. United States District Judge Laura Taylor Swain, who was then assigned to the case, denied Microban's application for a TRO on January 7, 2014, following oral argument. (Dkt. #3). Judge Swain found that Microban had failed to demonstrate that it

---

[11]   Microban raises a number of allegations and arguments with respect to its quality inspection of the finished products manufactured by Aluf. This issue is immaterial to the resolution of this motion and, as such, the Court need not wade into this dispute. (*See* Def. 56.1 ¶¶ 55-56; Pl. 56.1 Response ¶¶ 55-56).

would suffer irreparable harm during the pendency of its contemplated motion for a preliminary injunction.  (*Id.*).

Ultimately, the case was reassigned to the undersigned on January 8, 2014.  That day, Plaintiff notified the Court that it intended to move for summary judgment and a permanent injunction on an expedited basis, in lieu of moving for a preliminary injunction.

Pursuant to the briefing schedule set forth at a January 16, 2014 pre-motion conference (Dkt. #11), Plaintiff's motion for summary judgment was filed on January 31, 2014 (Dkt. #20), Defendant's opposition was filed on March 3, 2014 (Dkt. #25), and the motion was fully submitted as of the filing of Plaintiff's reply on March 10, 2014 (Dkt. #30).  Also pursuant to the Court's instructions, Defendant answered and filed various counterclaims on January 22, 2014 (Dkt. #13); Plaintiff answered those counterclaims on February 12, 2014 (Dkt. #24).[12]

## DISCUSSION

### A.   Plaintiff's Motion for Summary Judgment

#### 1.   Applicable Law

Plaintiff has moved for summary judgment and a permanent injunction as to the claims asserted in its Complaint.  Under Fed. R. Civ. P. 56(a), summary judgment may be granted only if all the submissions taken together "show[] that there is no genuine issue as to any material fact and the movant is

---

[12]   Aluf did not cross-move for summary judgment on its various counterclaims.  While Aluf's counterclaims are largely, if not completely, duplicative of the arguments it asserts here, the fact remains that neither party has specifically moved with respect to those counterclaims; thus, they remain in the case.

entitled to judgment as a matter of law." *See Celotex Corp.* v. *Catrett*, 477 U.S.
317, 322 (1986); *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

The moving party bears the initial burden of demonstrating "the absence
of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.  A fact is
"material" if it "might affect the outcome of the suit under the governing law,"
and is genuinely in dispute "if the evidence is such that a reasonable jury could
return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also*
*Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).
The movant may discharge this burden by showing that the nonmoving party
has "fail[ed] to make a showing sufficient to establish the existence of an
element essential to that party's case, and on which that party will bear the
burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan* v. *N.Y.*
*Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (finding summary judgment
appropriate where the non-moving party fails to "come forth with evidence
sufficient to permit a reasonable juror to return a verdict in his or her favor on
an essential element of a claim" (internal quotation marks omitted)).

If the moving party meets this burden, the nonmoving party must "set out
specific facts showing a genuine issue for trial" using affidavits or otherwise,
and cannot rely on the "mere allegations or denials" contained in the pleadings.
*Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright* v.
*Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  The nonmoving party "must do more
than simply show that there is some metaphysical doubt as to the material
facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586

(1986) (internal quotation marks omitted), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (quoting *Quarles* v. *General Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks* v. *Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher* v. *Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (internal quotation marks and citations omitted)).

### 2.   Discussion

Microban alleges two general categories of claims: those concerning Aluf's failure to pay, and those concerning Aluf's putative infringement of the Microban Marks.  As to the former, Microban alleges that it should receive immediately the $750,876 it is owed, under one or more of the theories of breach of contract, goods sold and delivered, or accounts stated under New York State law.  (Pl. Br. 8-10).  Aluf does not contest that it owes this amount, nor does it substantively respond to many of the arguments Microban makes in this regard.  Instead, Aluf premises its entire defense on what it deems its "absolute" right to use the Microban Marks indefinitely; this argument, of course, relates to Microban's second set of claims, for trademark infringement. (*See, e.g.*, Def. Opp. 4-5.  In other words, while Aluf does not contest that it owes Microban such a substantial sum, it conditions its willingness to pay on its ability to use the Microban Marks for an indeterminate additional period of

time, without paying any additional fees to Microban.  In light of this defense
strategy, the Court will first address Microban's trademark infringement claims.

### a.   Microban Is Entitled to Summary Judgment on Its Trademark Infringement Claims[13]

#### i.   Applicable Law

Microban brings claims for trademark infringement under the Lanham
Act, 15 U.S.C. §§ 1051-1072, 1091-1096, 1121-1129, 1141-1141n, as well as
under the common law of New York State.  (Pl. Br. 11-20).  In order to prevail on
its claims, Microban must demonstrate that (i) its marks are entitled to
protection; and (ii) Aluf's use of the marks is likely to cause consumer confusion
as to the origin or sponsorship of Aluf's goods.  *L & L Wings, Inc.* v. *Marco-
Destin, Inc.*, 676 F. Supp. 2d 179, 187 (S.D.N.Y. 2009) (citing *Gruner + Jahr USA
Publ'g* v. *Meredith Corp.*, 991 F.2d 1072, 1074 (2d Cir. 1993)); *see also Gucci
Am., Inc.* v. *Guess?, Inc.*, 868 F. Supp. 2d 207, 240 (S.D.N.Y. 2012) ("The
elements of trademark infringement under New York common law mirror the
Lanham Act.").[14]

#### ii.   The Microban Marks Are Entitled to Protection

First, in support of the validity of its Marks, Microban has submitted
Certificates of Registration from the Patent and Trademark Office dated

---

[13]   Microban has forgone its entitlement to statutory damages under 15 U.S.C. § 1117(c) on
its trademark infringement claims.  (Pl. Pre-Mot. Letter at 2 n.3 ("Plaintiff is willing to
forego its claims to monetary trademark damages" of up to $4 million "in the interest of
resolving this dispute expeditiously")).  Accordingly, the Court's determination of Aluf's
liability on this claim is made principally for the purposes of establishing Microban's
entitlement to a permanent injunction, discussed *infra*.

[14]   "[T]he same analysis applies to claims of trademark infringement under § 32," which
applies to registered marks, and § 43(a), which applies to registered or unregistered
marks.  *Louis Vuitton Malletier* v. *Dooney & Bourke, Inc.*, 454 F.3d 108, 114 (2d Cir.
2006) (internal citations omitted).

November 4, 1980, January 26, 1999, March 2, 1999, and August 27, 2002. (Kreps Decl. Ex. A). Such certificates are *prima facie* evidence "that the mark[s are] registered and valid (i.e., entitled to protection), that the registrant owns the mark[s], and that the registrant has the exclusive right to use the mark[s] in commerce." *Lorillard Tobacco Co.* v. *Jamelis Grocery, Inc.*, 378 F. Supp. 2d 448, 454 (S.D.N.Y. 2005) (internal quotation marks and citations omitted). Moreover, Aluf does not dispute that the Microban Marks at issue are registered and valid. (*See* Def. Opp. 12). Microban has satisfied the first element.

### iii. Microban Has Demonstrated a Likelihood of Consumer Confusion

Next, Microban has demonstrated a likelihood of consumer confusion. This is because "[w]hen an ex-licensee continues to use a mark after its license expires, likelihood of confusion is established as a matter of law." *L & L Wings*, 676 F. Supp. 2d at 188 (citing *Ryan* v. *Volpone Stamp. Co.*, 107 F. Supp. 2d 369, 399 (S.D.N.Y. 2000)); *accord C=Holdings B.V.* v. *Asiarim Corporation*, No. 12 Civ. 928 (RJS), — F. Supp. 2d —, 2013 WL 6987165, at *10 (S.D.N.Y. Dec. 16, 2013); *see also Bowmar Instrument Corp.* v. *Continental Microsystems, Inc.*, 497 F. Supp. 947, 959 (S.D.N.Y. 1980) (holding that continued use of a mark after termination of a license constitutes trademark infringement). "In such situations, confusion is almost inevitable because consumers have already associated the formerly licensed infringer with the trademark owner." *L & L Wings*, 676 F. Supp. 2d at 188 (citing *Ryan*, 107 F. Supp. 2d at 399).

Here, it is undisputed that Aluf's license to the Microban Marks expired on June 30, 2013, but that it has continued to market and co-brand its

antimicrobial trash bags in precisely the same manner since that date. Specifically, Aluf's website (i) uses the Microban Marks throughout to co-brand various lines of products; (ii) incorrectly claims that it has the exclusive right to use the Microban Compounds; (iii) dedicates two pages to an explanation of the benefits of Microban technology; and (iv) displays the Microban Mark on its page of its endorsements.  (*See* Kreps Decl. Ex. B).  Nowhere does Aluf clarify that its relationship with Microban has ended, that it no longer has the exclusive right to use the Microban Compounds, or that Aluf does not create the Microban technology.  That Aluf has not changed its marketing or use of the Microban Marks in any way since the termination of the Agreement could lead a consumer to "conclude that [Plaintiff] sponsors and has authorized these products."  *Ryan*, 107 F. Supp. 2d at 399; *see also Church of Scientology Int'l* v. *Elmira Mission of Church of Scientology*, 794 F.2d 38, 44 (2d Cir. 1986) (noting that consumers would be confused by having "already associated some significant source identification" between the former licensee's and licensor's products).[15]

What is more, Aluf has not changed the way it markets its goods as having been "approved" or "endorsed" by Microban; the consumer confusion requirement is satisfied on this basis as well.  *Dallas Cowboys Cheerleaders,*

---

[15]    Aluf attempts to differentiate *Church of Scientology* on the basis that it "refers to a pure license to use a name.  It did not deal with a case involving a seller of goods who delivered goods after the license allegedly expired and then claims that the buyer cannot re-sell those very same genuine goods using the seller's name." (Def. Opp. 13).  Without conceding the accuracy of Aluf's factual premises, the Court notes that Microban *is* bringing a claim for trademark infringement in connection with Aluf's use of the Microban name.  *Church of Scientology* is on point in that it deals with, as here, a former licensee's continued, unauthorized use of the licensor's trademarks.

16

*Inc.* v. *Pussycat Cinema, Ltd.*, 604 F.2d 200, 205 (2d Cir. 1979) ("The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement."); *see also Warner Bros., Inc.* v. *Gay Toys, Inc.*, 658 F.2d 76, 79 (2d Cir. 1981) (confusion can be premised on likelihood that public will be misled into believing that the defendant is distributing products "vouched for" or sponsored by the plaintiff).

### iv.   The *Polaroid* Factors, to the Extent Applicable, Also Weigh in Microban's Favor

Plaintiff has argued that it can also establish a likelihood of confusion under the test established in *Polaroid Corp.* v. *Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961).  (Pl. Br. 14-17).  As a preliminary matter, however, "[i]t is evident that the so-called *Polaroid* factors are more geared towards comparing two distinct, albeit similar, marks.  Thus, their application may be unnecessary in the case of an ex-licensee using a previously licensed mark where only one trademark is involved."  *Ryan*, 107 F. Supp. 2d at 400 (internal citations omitted); *see also L & L Wings, Inc.*, 676 F. Supp. 2d at 189 n.2.  While the Court agrees in principle with this analysis, it concludes that to the extent the *Polaroid* factors are applicable, Plaintiff has established that each factors weighs in its favor.

The *Polaroid* factors are: "[i] strength of the trademark; [ii] similarity of the marks; [iii] proximity of the products and their competitiveness with one another; [iv] evidence that the senior user may 'bridge the gap' by developing a product for sale in the market of the alleged infringer's product; [v] evidence of actual consumer confusion; [vi] evidence that the imitative mark was adopted in

bad faith; [vii] respective quality of the products; and [viii] sophistication of consumers in the relevant market." *Star Industries, Inc.* v. *Bacardi & Co. Ltd.*, 412 F.3d 373, 384 (2d Cir. 2005).

Microban has already demonstrated the strength of the Marks and the likelihood of consumer confusion, which go to the first, fifth, and eighth factors. As to the second factor, there is no junior mark because Aluf is using the actual Microban Marks. For this reason, Aluf's contention that "[t]he *Polaroid* factors are not applicable because [they compare] two marks; here, we are dealing with one trademark that was admittedly used to sell genuine goods," is incorrect. (Def. Opp. 15). Because Aluf's use of the Microban Marks is unauthorized, its marks are counterfeit (albeit identical) marks. *See Burberry Ltd.* v. *Euro Moda, Inc.*, No. 08 Civ. 5781 (CM), 2009 WL 1675080, at *12 (S.D.N.Y. June 10, 2009). As to the third and fourth factors, the Court finds that antimicrobial materials and trash bags incorporating antimicrobial materials are sufficiently similar. (S*ee* Pl. Br. 16).

Lastly, Aluf has shown bad faith, in satisfaction of the sixth factor. In the trademark infringement context, "[b]ad faith generally refers to an attempt by a junior user of a mark to exploit the good will and reputation of a senior user by adopting the mark with the intent to sow confusion between the two companies' products." *Starbucks Corp.* v. *Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 117-18 (2d Cir. 2009) (internal citation omitted); *see also Pfizer Inc.* v. *Sachs*, 652 F. Supp. 2d 512, 527 (S.D.N.Y. 2009) ("In determining whether a defendant's infringing or diluting conduct was carried out in bad faith, courts can rely on

18

the considerable jurisprudence that has been developed applying the 'good faith' prong of the *Polaroid* test." (internal quotation marks and citation omitted)). "[D]eliberate copying may indicate that the defendant acted in bad faith." *Starbucks Corp.*, 588 F.3d at 118 (citing *Paddington Corp.* v. *Attiki Importers & Distributors, Inc.*, 996 F.2d 577, 587 (2d Cir. 1993)).

Courts have found bad faith where defendants have failed to comply with cease and desist letters without consulting counsel, and have instead threatened continued infringement.  *See, e.g.*, *Pfizer Inc.*, 652 F. Supp. 2d at 523; *New York State Soc. of Certified Pub. Accountants* v. *Eric Louis Assoc., Inc.*, 79 F. Supp. 2d 331, 350 (S.D.N.Y. 1999) (awarding fees based on findings of willfulness and bad faith, where defendants failed to comply with cease-and-desist letters and continued infringing on mark without consulting counsel). Courts have also found bad faith where defendants used a plaintiff's marks in an attempt to capitalize on the plaintiff's goodwill.  *Pfizer Inc.*, 652 F. Supp. 2d at 527 (finding bad faith where, among other things, "Defendants used the Viagra Marks in an attempt to capitalize on Pfizer's goodwill"); *see also Aris Isotoner Inc.* v. *Dong Jin Trading Co., Inc.*, No. 87 Civ. 890 (RO), 1989 WL 236526, at *5 (S.D.N.Y. Sept. 22, 1989) (awarding fees where defendant "intended to reap the benefit" of plaintiff's mark).

Aluf has done both.  As discussed *supra*, Aluf disregarded numerous requests to cease its infringement of Microban's Marks, including two separate cease and desist letters.  What is perhaps more egregious, Aluf has displayed an awareness and understanding that it could not continue to use the Microban

19

Marks after termination of the Agreement, yet has persisted for more than 10 months to do so anyway.  (*See* Pl. 56.1 ¶ 42 (September 2013 e-mail from Ayrovainen, "*I heard recently that our use of the Microban trademark does not come close to covering that same time frame.*  This is concerning to say the least." (emphasis added))).  And to make matters worse, Aluf attempted — both prior to the initiation of this lawsuit and now before this Court — to leverage its debt to Microban into a long-term (if not in-perpetuity) license for free use of the Microban Marks.  Aluf's actions constituted bad faith.  Microban has demonstrated that the *Polaroid* factors, to the extent applicable, weigh in its favor.

Microban has thus demonstrated that it is entitled to summary judgment on its trademark infringement claims, having demonstrated that (i) its Marks are entitled to protection; and (ii) Aluf's use of the Marks is likely to cause consumer confusion.  Moreover, for the reasons discussed below, Aluf's affirmative defenses — the exhaustion and genuine goods doctrines, and the argument that Aluf was granted an implied license — serve as no defense to its infringement.

### v.    The Exhaustion Doctrine Is No Defense to Aluf's Infringement

#### (a)    The Exhaustion Doctrine Generally

Aluf argues in response to Plaintiff's claims of infringement that, under the "first use" or "exhaustion" doctrine, Aluf is entitled to use the Microban Marks indefinitely because it is selling "genuine" Microban goods.  Aluf's reliance on this doctrine is factually and legally untenable.  As but one example,

Aluf declares repeatedly that it is entitled to sell its "genuine goods," without addressing the foundational issue of whether the exhaustion doctrine applies in the first place.  (*See* Def. Opp. 12-17).[16]  The doctrine does not apply, and even if it did, Aluf's alteration of the goods it received from Microban renders them not genuine.

The exhaustion doctrine states that, "'[a]s a general rule, trademark law does not reach the sale of genuine goods bearing a true mark even though the sale is not authorized by the mark owner." *Polymer Technology Corp.* v. *Mimran*, 975 F.2d 58, 61 (2d Cir. 1992) (internal citation omitted).  This idea is also referred to as the first sale doctrine, as it is in copyright law, "insofar as it recognizes that the right of a producer to control distribution of its trademarked product does not extend beyond the first sale of the product." *Bel Canto Design, Ltd.* v. *MSS Hifi, Inc.*, 837 F. Supp. 2d 208, 222 (S.D.N.Y. 2011) (internal

---

[16]     Perhaps the most noteworthy rhetorical technique Aluf employs is its repeated lambasting of Microban for its use of "buzz-words," which is noteworthy insofar as it is Aluf, not Microban, who relies more on "buzz-words" than actual legal argument. (*See, e.g.,* Def. Opp. 5, 16, 20, 21, 22, 23 n.2).  One such example is Aluf's criticism of Microban for citing *Church of Scientology*, a case that is directly on point.  In so doing, Aluf scolds: "[a]ttorneys are obligated to cite the appropriate cases to the Court.  They can distinguish them but they should not ignore them.  A case in point which plaintiff fails to cite is *Sebastian Int'l* v. *Longs Drug Stores, Corp.*, 53 F.3d 1073 (9th Cir. 1995)." (*Id.* at 13 (internal citation omitted)).

"First, [Aluf's] contention is flatly contradicted by the well-settled principle in the federal court system that decisions in one circuit are not binding on district courts in another circuit." *Right to Life of Dutchess Cnty., Inc.* v. *Fed. Election Comm'n*, 6 F. Supp. 2d 248, 253 (S.D.N.Y. 1998) (citing, *inter alia, Menowitz* v. *Brown*, 991 F.2d 36, 40 (2d Cir. 1993)).  Second, *Sebastian Int'l* is not inconsistent with the Second Circuit cases discussed herein, and in any event does not support Aluf's argument.  In *Sebastian Int'l*, the Ninth Circuit applied the "first sale" doctrine to a downstream purchaser who bought the plaintiff's hair care products from an authorized distributor, who had in turn purchased those products from the plaintiff.  53 F.3d at 1076.  Accordingly, the Court held that "[w]hen a purchaser resells a trademarked article under the producer's trademark, and nothing more, there is no actionable misrepresentation under the statute." *Id.*  The facts of this case are clearly inapposite; as discussed throughout, the exhaustion doctrine does not apply because Microban did not authorize the first sale, even if it had, Aluf altered the goods such that they are no longer genuine.

quotation marks and citations omitted).[17]   A court applying the exhaustion

doctrine must do so in two steps:

> First, the court must consider whether the trademark
> owner authorized the first sale of the goods. Second,
> the court must consider whether the goods were
> genuine.  If the initial sale was authorized, the court
> must undertake the second part of the analysis and
> determine whether, as a matter of fact, the goods
> which were later resold without authorization were
> genuine. If the goods were genuine, there is no
> violation of the Lanham Act despite the fact that the
> goods were resold without the trademark owner's
> consent.  If the goods were not genuine, that is[,]
> altered or not in keeping with the trademark owner's
> quality standards, a valid claim for trademark
> infringement is established.  If the trademark owner
> did not approve the original sale, the goods cannot be
> considered genuine as a matter of law and
> infringement is established.

*Ryan*, 107 F. Supp. 2d at 382; *cf. Zino Davidoff SA* v. *CVS Corp.*, 571 F.3d 238,

243 (2d Cir. 2009) (holding that goods are not "genuine" if "they do not conform

to the trademark holder's quality control standards, or if they differ materially

---

[17]   The exhaustion doctrine in the trademark context and the first sale doctrine in the copyright context are not perfect analogues, as the Second Circuit has recognized.  In a summary order, the Court declined to "modify the 'first sale doctrine' in the trademark context into a *per se* rule so that it conforms with copyright's first sale doctrine." *Fendi Adele S.R.L.* v. *Burlington Coat Factory Warehouse Corp.*, 222 F. App'x 25, 26 (2d Cir. 2007) (summary order).  Judge Scheindlin also recognized this difference several years ago in an analogous case, writing:

> In the copyright context, the whole point of the first sale doctrine
> is that once the copyright owner places a copyrighted item in the
> stream of commerce by selling it, he has exhausted his exclusive
> statutory right to control its distribution, and therefore a later
> sale does not frustrate the purpose of copyright law.  *By contrast,
> when an unauthorized sale of a trademarked product takes place
> after the first sale, if that next sale causes consumer confusion or
> dilution of the trademark owner's goodwill, the purpose of
> trademark law* is *frustrated.*

*Dan-Foam A/S* v. *Brand Named Beds, LLC*, 500 F. Supp. 2d 296, 317 n.168 (S.D.N.Y. 2007) (citing *Quality King Distribs.* v. *L'anza Research Int'l*, 523 U.S. 135, 152 (1998) (internal quotation marks omitted, emphasis added)).

from the product authorized by the trademark holder for sale" (citing, *inter alia*, *Polymer Tech. Corp.* v. *Mimran*, 37 F.3d 74, 78 (2d Cir. 1994))).  For this reason, the exhaustion doctrine is most typically invoked by a downstream purchaser when "the initial sale of the trademarked goods was authorized, and the second or subsequent sale is contested."  *Liz Claiborne, Inc.* v. *Mademoiselle Knitwear, Inc.*, 979 F. Supp. 224, 230 (S.D.N.Y. 1997) (internal citation omitted).

### (b)   The Exhaustion Doctrine Does Not Apply

As noted, Aluf contends that it may continue to use the Microban Marks because it is selling "genuine" goods.  (Def. Opp. 12-17).  "The question of whether a good is genuine, however, presupposes the initial sale was authorized"; for that reason, the Court must first examine whether Microban authorized the initial sale.  *Liz Claiborne, Inc.*, 979 F. Supp. at 230.

Aluf has introduced no evidence indicating that Microban approved any initial sale.  In fact, neither party has briefed whether Microban approved the initial sale — or even, perhaps more crucially, what the first sale was.  The Court will consider this issue in light of two possible "first sales": Microban's sale of the Microban Compounds to Aluf, and Aluf's sales of the trash bags it manufactured with the Microban Compounds to third-party customers.

It is well-settled that "[t]rademarked goods produced by a manufacturer under contract with the trademark owner are not genuine goods *until their sale under the mark is authorized by the trademark owner.*"  *Liz Claiborne, Inc.*, 979 F. Supp. at 230 (citing RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 24, comment c (1995) (internal quotation marks omitted, emphasis added)); *see*

23

*also El Greco Leather Products, Inc.* v. *Shoe World*, 806 F.2d 392, 395 (2d Cir.

1986) (absent trademark holders' consent to the original sale by shoe

manufacturer, retailer's resales were not of genuinely-trademarked shoes); *By

Design PLC* v. *Ben Elias Indus. Corp.*, No. 98 Civ. 4588 (LAP), 1998 WL 998964,

at *4 (S.D.N.Y. July 15, 1998) ("Here, By Design denies that it authorized the

sales in question, and defendant submits no admissible evidence to the

contrary.").  Conversely, "a markholder may no longer control branded goods

after releasing them into the stream of commerce," and for that reason,

downstream purchasers are "free to display and advertise the branded goods."

*Osawa & Co.* v. *B & H Photo*, 589 F. Supp. 1163, 1173 (S.D.N.Y. 1984) (internal

citations omitted).  Thus, the exhaustion doctrine applies only if Microban

authorized the initial sale, thereby exhausting "its right to control distribution of

its trademarked product."  *Bel Canto Design, Ltd.*, 837 F. Supp. 2d at 222

(internal quotation marks and citation omitted).

Generally, a former licensee may not invoke the exhaustion doctrine for

any goods sold after the termination of the licensing agreement, even if they

were manufactured while the agreement was still valid.  *Ryan*, 107 F. Supp. 2d

at 382-83.  The logic underlying this maxim is that licensor's approval for any

sales terminated along with the licensing agreement, irrespective of whether the

goods were manufactured while the licensing agreement was valid.  *Id.*; *see also

Mktg. Products Mgmt., LLC* v. *Healthandbeautydirect.com, Inc.*, 333 F. Supp. 2d

418, 432 (D. Md. 2004) ("a franchisor or similar licensor of trademarked goods

and services has a federally-protected, enforceable right to *impose conditions on*

24

the use of its marks, and to *withdraw* its permission for the continued use of its

marks, in interstate commerce so as to avoid a 'likelihood of confusion,' i.e., to

protect its rights in maintaining the purity, quality, or soundness of its licensed

goods and services" (internal citation omitted, emphases in original)).

For example, in *Ryan*, the court found that "neither the first sale rule nor

the genuine goods doctrine serve[d] as a proper defense," because the defendant

"had no right to sell Nolan Ryan products after its license was terminated

regardless of when the goods were manufactured[, because] Plaintiff had not

authorized the initial sale or released them into the stream of commerce." 107

F. Supp. 2d at 382-83.  Similarly, in *Bill Blass, Ltd.* v. *SAZ Corp.*, the Third

Circuit affirmed the issuance of preliminary injunction barring a former licensee

from selling off its remaining inventory using the licensor's marks, noting that

"the licensee … undertook the risk that if it kept its inventory at too high a level

the inventory might not be sold by the expiration date of the license." 751 F.2d

152, 155 (3d Cir. 1984); *see also Rogers* v. *HSN Direct Joint Venture*, No. 97 Civ.

7710 (LLS), 1999 WL 728651, at *2-3 (S.D.N.Y. Sept. 17, 1999) (exhaustion

doctrine permitted former licensee to sell only that product it had purchased

through a third-party distributor, but not that product the former licensee had

manufactured while the licensing agreement was still valid, and for which the

former licensee did not have the licensor's approval to sell).  Conversely, in

*Sasson Jeans, Inc.* v. *Sasson Jeans, L.A., Inc.*, a former licensee properly invoked

the exhaustion doctrine where the parties had executed a post-termination

agreement providing for a sell-off period of unsold inventory.  632 F. Supp. 1525, 1529 (S.D.N.Y. 1986).

It follows, then, that the majority of cases in which the exhaustion doctrine was properly invoked were cases that involve downstream purchasers who purchased the goods from the plaintiff, or from someone to whom the plaintiff had initially sold those goods.  *See, e.g.*, *Polymer Tech. Corp.*, 37 F.3d at 80-81 (where plaintiff had released its product into the stream of commerce by selling it to authorized distributors, the exhaustion doctrine applied to action brought against the defendant, who had purchased the product from authorized distributors and sought to resell it); *O.D.F. Optronics Ltd.* v. *Remington Arms Co., Inc.*, No. 08 Civ. 4746 (DLC), 2008 WL 4410130, at *13 (S.D.N.Y. Sept. 26, 2008) (finding exhaustion doctrine applicable where "Remington purchased the EyeBall products in question from ODF, and as such there was a first sale from ODF to Remington that exhausted the patent and trademark rights that ODF seeks to vindicate"); *H.L. Hayden Co. of New York, Inc.* v. *Siemens Med. Sys., Inc.*, 879 F.2d 1005 (2d Cir. 1989) (finding no consumer confusion for resale of a trademarked good).

It is undisputed that Aluf legitimately purchased the Microban Compounds from Microban; as a result, Microban's right to control how the Microban Compounds were sold was arguably exhausted by that first sale.  In other words, if Aluf were simply reselling the Microban Compounds to a downstream purchaser, the application of the exhaustion doctrine would be analogous to *Polymer Technology* and *O.D.F. Optronics.*  Aluf, however, is not

26

selling the Microban Compounds, a concept discussed more fully in the following section.  Aluf is selling a new product, albeit one made with Microban Compounds, that was (and was agreed between the parties to be) manufactured by Aluf during the pendency of the Agreement.  On these facts, the relevant first sale was not of the Microban Compounds to Aluf, but of Aluf's trash bags to its customers.  Significantly, however, Microban's approval for any future sales, even of product manufactured during the pendency of the Agreement, expired along with the Agreement.  The exhaustion doctrine is inapplicable here because Aluf had no legal right to sell Microban-branded trash bags after the Agreement terminated, regardless of when the bags were manufactured, because Microban "had not authorized the initial sale or released them into the stream of commerce."  *Ryan*, 107 F. Supp. 2d at 382-83.

### (c)    The Goods Are Not Genuine

Goods cannot be genuine if the mark-holder did not authorize their initial sale.  *See, e.g.*, *Ryan*, 107 F. Supp. 2d at 382-83.  Microban's approval for any sales of Aluf's trash bags terminated along with the Agreement, and on that basis alone, the Court need not reach the second prong of the exhaustion doctrine, i.e., whether the goods are genuine.  However, the Court will do so, in no small part because Aluf has premised its entire defense on its belief in the applicability of this concept.

The genuine goods exception is properly invoked only where the first sale was authorized; here, the only authorized sale was of the Microban Compounds to Aluf.  Importantly, however, this exception applies only when the defendant

"resell[s] a branded item in an *unchanged* state." *Dan-Foam A/S*, 500 F. Supp.
2d at 326 (internal quotation marks and citation omitted); *see also Zino Davidoff
SA*, 571 F.3d at 243 (goods are not "genuine" if "they differ materially from the
product authorized by the trademark holder for sale" (citing, *inter alia*, *Original
Appalachian Artworks, Inc.* v. *Granada Elecs., Inc.*, 816 F.2d 68, 73 (2d Cir.
1987))).  Thus, as here, "when a trademarked product that is being resold is
'materially different' from the product as it is sold by the plaintiff, it is not a
'genuine article.'" *Bel Canto Design, Ltd.*, 837 F. Supp. 2d at 223 (internal
citation omitted); *see also id.* at 223-224 ("when a defendant does no more than
stock and resell a plaintiff's trademarked products, no possibility of confusion
exists, because the consumer gets just what he thinks he is going to get.  On
the other hand, when a defendant sells a product that is materially different …
it is presumed likely that the undisclosed difference between the products will
confuse consumers and damage the plaintiff's good will." (citing *Beltronics*, 562
F.3d at 1074 (internal quotation marks omitted))).

    Aluf can by no stretch of the imagination argue that it is simply stocking
and reselling Microban's trash bags; to the contrary, it is using the Microban
Compounds to manufacture trash bags, and then marketing and selling those
bags as Microban's product.  It is undisputed that Aluf is not selling the
Microban Compound in an unchanged state, its "state" has been changed in
nearly every respect.  On this basis, Aluf's continuing use of the Microban
Marks for a completely separate product will likely cause consumer confusion
and damage Microban's goodwill.

Perhaps unsurprisingly, Aluf has cited to no case in which a product was altered to this extent but still held to be "genuine."  The relevant case law makes quite clear that the alterations at issue place this case far beyond the pale of the genuine goods exception.  *See, e.g.*, *Original Appalachian Artworks, Inc.*, 816 F.2d at 70 (although Cabbage Patch dolls imported from Spain were not physically altered from those sold in the U.S., they were "altered" in that "the sale of these dolls in the U.S. upsets the settled expectations of U.S. consumers about what they will receive when they purchase a Cabbage Patch doll"); *Zino Davidoff SA*, 571 F.3d at 243 (alteration of a product's UPC code, without more, could constitute alteration in a claim for trademark infringement); *Cutler-Hammer, Inc.* v. *Universal Relay Corp.*, 285 F. Supp. 636, 639 (S.D.N.Y. 1968) (finding that the relabeling of a product to indicate that the product meets current standards constituted a "material alteration of the product and a misuse of plaintiff's trademark"); *see also Davidoff & CIE, S.A.* v. *PLD Int'l Corp.*, 263 F.3d 1297 (11th Cir. 2001) (finding that the etching of glass bottles to remove batch codes was material alteration of product that created a likelihood of consumer confusion).  On this basis, neither the exhaustion doctrine nor the genuine goods exception can serve as valid defenses to Aluf's continued infringement, and Aluf is liable to Microban for that infringement.

### vi.   **Aluf's Co-Branding Further Satisfies the Consumer Confusion Test**

Moreover, even if the exhaustion doctrine applied, and even if the goods were genuine, the consumer confusion requirement of Plaintiff's trademark infringement claims would nonetheless be satisfied because Aluf's continued

marketing of its trash bags as a co-brand falsely implies a relationship between Aluf and Microban that does not exist.  *See Dow Jones & Co., Inc.* v. *Int'l Sec. Exch., Inc.*, 451 F.3d 295, 308 (2d Cir. 2006) ("While a trademark conveys an exclusive right to the use of a mark in commerce in the area reserved, that right generally does not prevent one who trades a branded product from accurately describing it by its brand name, *so long as the trader does not create confusion by implying an affiliation with the owner of the product.*" (collecting cases) (emphasis added)); *see also Dallas Cowboys Cheerleaders*, 604 F.2d at 205 ("The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement").

### vii.  Aluf Was Not Granted an Implied License to Use the Microban Marks

Aluf next argues that it was granted an implied license to use the Microban Marks after the Agreement's termination.  (Def. Opp. 17-18).  It was not.  Aluf fails to cite to any relevant case law in advancing this argument, instead opting to cite to cases applying patent law; yet even had it briefed the correct law, its argument would fail.

Aluf, as the alleged licensee, bears the burden of demonstrating that there was "a meeting of the minds as determined by contract law."  *Pavlica* v. *Behr*, 397 F. Supp. 2d 519, 526 (S.D.N.Y. 2005) (citing, *inter alia*, *Bourne* v. *Walt Disney Co.*, 68 F.3d 621, 631 (2d Cir. 1995)).  "The Second Circuit has clarified, however, that 'courts have found implied licenses only in narrow circumstances where one party created a work at the other's request and handed it over, intending that the other copy and distribute it.'"  *Id.* (citing *SmithKline Beecham*

30

*Consumer Healthcare, L.P.* v. *Watson Pharm., Inc.*, 211 F.3d 21, 25 (2d Cir. 2000)).  The undisputed evidence makes clear that there was no meeting of the minds; in fact, Microban has repeatedly importuned Aluf to cease its infringing conduct, to no avail.  Moreover, Aluf was clearly aware that it could not continue to use the Marks without paying further licensing fees, but did so anyway.  Aluf has failed to demonstrate that it was granted an implied license.

In sum, Aluf's defense to this entire action rises and falls on its contention that it has an "absolute right" to liquidate its inventory using the Microban Marks, for which it contends it paid a premium.  (Def. Pre-Mot. Letter at 2).[18]  However, that "absolute right" is one untethered to the record or the case law.  As the *Ryan* court astutely noted,

> if a licensee could sell inventory manufactured during the term of the license over an indefinite period after its termination or expiration, the expiration date would have little force or meaning. One can imagine a scenario where a licensee intentionally creates a large surplus and thereby grants to itself a de facto extension of the license.... Defendant does not have the right to liquidate its inventory and disregard

---

[18]    Specifically, Aluf contends that because generic antimicrobial product is "far cheaper" than the Microban Compound, the price differential between the two must represent the "premium" that Aluf paid to use the Microban Marks.  (*See* Rosenberg Decl. ¶¶ 17-21). Thus, Aluf reasons, that "premium" entitles Aluf to use the Microban Marks indefinitely. (*Id.*).  Aluf's current understanding of the price structure of the Microban Compound is unsupported by the terms of the Agreement and, more importantly, would render the termination provision, as the *Ryan* court noted, a nullity.  Aluf could have negotiated for a provision, as do many businesses, providing for a sell-off period for its remaining inventory.  *See, e.g., O.D.F. Optronics Ltd.*, 2008 WL 4410130, at *2 ("[T]he Distribution Agreement had a termination clause that contemplated a six month period for Remington to sell its inventory. The parties, however, negotiated a shortened sell-off period of two months."); *Sasson Jeans*, 632 F. Supp. at 1529 (parties had executed post-termination agreement providing for sell-off period of unsold inventory; noting that "[i]t is the existence of this continuing imprimatur from [plaintiff] which renders the goods 'genuine'").  Aluf did no such thing.  That Aluf paid what it considers to be a "premium" for the Microban Compound is of no moment: its legal right to use the Microban Marks expired on June 30, 2013, and any further use constitutes trademark infringement.

> Plaintiff's objections, simply because the products
> were manufactured prior to termination.

*Ryan*, 107 F. Supp. 2d at 385.

Though the Court is mindful that it may be easier for Aluf to sell off its inventory by using the Microban Marks as a co-brand, the fact remains that such use plainly constitutes trademark infringement.[19]  Aluf has offered no viable defense for its actions, and Plaintiff is entitled to summary judgment on its claims for trademark infringement under the Lanham Act and New York State law.

### b.    Plaintiff Is Entitled to Summary Judgment on Its New York State Law Claims

Microban also brings various New York State law claims.  It first advances claims for trademark dilution and unfair competition, for which it does not

---

[19]    As Plaintiff has repeatedly noted, Aluf would be within the bounds of trademark law to market its goods as containing "Microban technology."  (Jan. 7 Tr. 17 ("[Plaintiff's counsel]: ALUF can still sell the product and they can still sell the product by accurately describing what the product is.  They can say 'Made with Microban technology,' something to that effect.  We are not saying that they can't use the word Microban.... What we are saying is they can't use the trademark in exactly same way they were doing when there was a co-branding relationship between the parties.")).  This is because Aluf has a well-settled right to "indicate the origin of the goods," as it is obligated "only to tell the truth, and the whole truth, and to tell it plainly." *Dan-Foam A/S*, 500 F. Supp. 2d at 319 (citing *Champion Spark Plug Co.* v. *Sanders*, 156 F.2d 488, 491-92 (2d Cir. 1946) (internal quotation marks omitted)); *Bel Canto Design, Ltd.*, 837 F. Supp. 2d at 224 ("[I]f the defendant sufficiently discloses the existence of the difference alleged to be material, then the possibility of confusion arising from the difference is dispelled." (internal quotation marks and citation omitted)).

"But where a defendant resells a trademarked product under the manufacturer's trademark and does *not* tell the whole truth so as to cause confusion, or to cause mistake, or to deceive as to the source or sponsorship of the product, or to cause dilution by blurring or dilution by tarnishment of the famous mark, defendant cannot hide behind the first sale doctrine." *Dan-Foam A/S*, 500 F. Supp. 2d at 319 (emphasis in original) (internal quotation marks and citation omitted).  Plaintiff offered to allow Aluf to use the Microban name to denote the origin of its trash bags — "using Microban technology" — and it may do just that.  (Jan. 7 Tr. 17).  What Aluf may not do, however, is to use the Microban Mark as a co-brand; nor may it falsely claim that Microban endorses the product, that Microban and Aluf are associated, or that Aluf has the exclusive right to utilize the Microban Compounds.

request damages.  Microban also seeks to recover the $750,876 Aluf owes, under the alternative theories of goods sold and delivered, account stated, and breach of contract.  For the reasons discussed below, Microban is entitled to summary judgment on all of its New York State law claims.

### i.    Trademark Dilution

Plaintiff alleges a claim for trademark dilution under New York General Business Law ("GBL") § 360-*l*.  (Pl. Br. 19-20).  To prevail on this claim, Microban "must prove [i] that the trademark is truly distinctive or has acquired secondary meaning, and [ii] a likelihood of dilution either as a result of 'blurring' or 'tarnishment.'"  *U-Neek* v. *Wal-Mart Stores, Inc.*, 147 F. Supp. 2d 158, 175 (S.D.N.Y. 2001) (internal citation omitted).

As discussed *supra*, Microban has satisfied the first element because the Microban Marks are registered, incontestable, and truly distinctive.  As to the second element, "'[d]ilution by 'blurring' may occur where the defendant uses or modifies the plaintiff's trademark to identify the defendants' goods and services, raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product.'"  *L & L Wings, Inc.*, 676 F. Supp. 2d at 189 (citing *U-Neek*, 147 F. Supp. 2d at 175).  Thus, "New York courts consider six factors to determine whether blurring is likely, the first five of which are 'closely analogous' to the *Polaroid* factors, which this Court has already determined [] favor [] the Plaintiff."  *Id.* (citing *Paco Sport, Ltd.* v. *Paco Rabanne Parfums*, 86 F. Supp. 2d 305, 330 (S.D.N.Y. 2000)).  Those factors are: "[i] similarity of the marks, [ii] similarity of the products covered by the marks, [iii] sophistication of

33

consumers, [iv] predatory intent, [v] renown of the senior mark, [and vi] renown of the junior mark." *Mead Data Cent., Inc.* v. *Toyota Motor Sales, Inc.*, 875 F.2d 1026, 1035 (2d Cir. 1989).

First, Aluf's infringement of the actual Microban Marks establishes a *per se* claim for trademark dilution. *See Savin Corp.* v. *Savin Grp.*, 391 F.3d 439, 453 (2d Cir. 2004) (applying federal dilution standard, and holding that "for the presumption of dilution to apply, the marks must be identical"); *Nabisco, Inc.* v. *PF Brands, Inc.*, 191 F.3d 208, 215 n.1 (2d Cir. 1999) (stating that federal and New York dilution statutes are "analogous"); *Fendi Adele S.R.L.* v. *Filene's Basement, Inc.*, 696 F. Supp. 2d 368, 391 (S.D.N.Y. 2010) (applying presumption to New York State law dilution claim); *Burberry Ltd.*, 2009 WL 1675080, at *12-15 (applying federal dilution standard, and holding that where the defendants used counterfeit marks, dilution was established as a matter of law). Second, as discussed *supra*, the Court has already determined that the *Polaroid* factors weigh strongly in Microban's favor; thus, even without this presumption, a review of the relevant factors makes clear that Microban has stated a claim for dilution.

In response, Aluf first denounces Microban's arguments as "speculative at best and supported by nothing," and then notes that "buzz words do[] not make out a claim," but a showing of bad faith does. (Def. Opp. 21). As it happens, the Court has already found Aluf to have acted in bad faith in resolving Plaintiff's infringement claims, but a claim for trademark dilution under N.Y. GBL § 360-*l* has no similar requirement. As Plaintiff notes in reply, Aluf

misquotes the relevant authority.  (*Compare* Def. Opp. 22 (citing *Tiffany (NJ) Inc.* v. *eBay, Inc.*, 576 F. Supp. 2d 463 (S.D.N.Y. 2008)), *with* Pl. Reply 6 n.8 ("However, in *Tiffany*, when noting the requirement of bad faith, the court was discussing a claim for unfair competition under New York common law, not dilution under GBL 360-*l*.")).

Aluf also argues that none of the cases cited by Plaintiff in support of its trademark dilution claim deals with the exhaustion doctrine (Def. Opp. 21-22); however, the Court has already determined that doctrine to be inapplicable. More importantly, Defendant fails to explain how this doctrine is in any way a defense to a trademark dilution claim.  Accordingly, Plaintiff is entitled to summary judgment on its claim for trademark dilution.  However, Plaintiff has not requested, and the Court sees no reason to award, additional damages for this claim.

### ii.    Unfair Competition

"The essence of an unfair competition claim is that one may not misappropriate the results of the labor, skills and expenditures of another; the tort functions to protect 'property rights of value ... from *any form* of commercial immorality." *Norbrook Labs. Ltd.* v. *G.C. Hanford Mfg. Co.*, 297 F. Supp. 2d 463, 491 (S.D.N.Y. 2003) (internal citations omitted, emphasis in original).  As such, a claim for unfair competition "requires allegations of 'unfairness and an unjustifiable attempt to profit from another's expenditure of time, labor and talent." *Greenblatt* v. *Prescription Plan Servs. Corp.*, 783 F. Supp. 814, 825 (S.D.N.Y. 1992) (internal quotation marks and citation omitted).

In contrast to a claim of trademark dilution, a claim of unfair competition requires a showing of bad faith. *Jeffrey Milstein, Inc.* v. *Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 34-35 (2d Cir. 1995); *see also Metito (Overseas) Ltd.* v. *Gen. Elec. Co.*, No. 05 Civ. 9478 (GEL), 2009 WL 399221, at *13 (S.D.N.Y. Feb. 18, 2009) (same). As discussed *supra*, the Court has already found there to be bad faith; accordingly, Microban is entitled to summary judgment on its unfair competition claim. Here, too, Plaintiff has not requested damages on this claim, and the Court will not award any.

### iii.   Goods Sold and Delivered

Next, Plaintiff brings claims under the doctrines of goods sold and delivered, account stated, and breach of contract, seeking to recover the $750,876 that both parties concede is owed to Microban. (Pl. Br. 8-10). Under the doctrine of goods sold and delivered, a plaintiff must demonstrate that (i) he had a valid contract with the buyer; (ii) the buyer failed to pay the purchase price; and (iii) the buyer accepted the goods. *Kasper Global Collection & Brokers, Inc.* v. *Global Cabinets & Furniture Mfrs. Inc.*, 952 F. Supp. 2d 542, 571 (S.D.N.Y. 2013) (citing N.Y. U.C.C. § 2-709(1)(a)); *see also Daewoo Int'l (Am.) Corp. Creditor Trust* v. *SSTS Am. Corp.*, No. 02 Civ. 9629 (NRB), 2004 WL 830079, at *2 (S.D.N.Y. Apr. 13, 2004) ("The essential elements of an action for goods sold and delivered are the purchase, sale and delivery of goods at an established price and nonpayment therefor." (internal citations omitted)).[20]

---

[20]   The parties agree that the Agreement is governed by New York law, and that it is a contract for the sale of goods that falls under the purview of Article 2 of New York's Uniform Commercial Code. *See* N.Y. U.C.C. § 2-102. (Pl. Br. 8 n.7; Def. Opp. 6).

A buyer accepts goods when that buyer (i) "has a reasonable opportunity to inspect goods and signifies to the seller that the goods are conforming or that he will take or retain them in spite of their non-conformity"; (ii) "does not effectively reject the goods"; or (iii) "does any act inconsistent with the seller's ownership." *Movado Grp., Inc.* v. *Caseiko Trading Co., Inc.*, 912 F. Supp. 2d 109, 114 (S.D.N.Y. 2012) (citing N.Y. U.C.C. § 2-606(a)-(c) (internal quotation marks omitted)). "Goods that a buyer has in its possession necessarily are accepted or rejected by the time a reasonable opportunity for inspecting them passes." *Weil* v. *Murray*, 161 F. Supp. 2d 250, 256 (S.D.N.Y. 2001) (citing *Seabury Constr.* v. *Jeffrey Chain Corp.*, No. 98 Civ. 5941(MBM), 2000 WL 1170109, at *2 (S.D.N.Y. Aug. 17, 2000)).

Aluf concedes that "when someone purchases goods, the goods should be paid for," but does not otherwise engage Microban's argument on this point. (*See* Def. Opp. 11-12). Nonetheless, the Court must still review Microban's claim, even if unopposed. *See Vermont Teddy Bear Co., Inc.* v. *1-800 Beargram Co.*, 373 F.3d 241, 246 (2d Cir. 2004). Here, it is undisputed that (i) the parties had a valid contract; (ii) Aluf failed to pay the full purchase price for the Microban Compounds; and (iii) Aluf took possession of the Microban Compounds by July 2013 and has never rejected the goods. Microban is entitled to summary judgment on this basis.

### iv.   Account Stated

Microban is alternatively entitled to recover under the doctrine of account stated. To prevail on a claim for account stated under New York law, a plaintiff

must establish that (i) an account was presented; (ii) it was accepted as correct; and (iii) the debtor promised to pay the amount stated. *Kasper*, 952 F. Supp. 2d at 570 (citing *IMG Fragrance Brands, LLC* v. *Houbigant, Inc.*, 679 F. Supp. 2d 395, 411 (S.D.N.Y. 2009)).  "The second and third elements of account stated may be implied if a party receiving a statement of account keeps it without objecting to it within a reasonable time or if the debtor makes partial payment." *Id.* (internal quotation marks and citation omitted).  "An objection to an account stated that is first made only after litigation on the account stated has been commenced is, as a matter of law, not made within a reasonable time." *White Diamond Co., Ltd.* v. *Castco, Inc.*, 436 F. Supp. 2d 615, 623 (S.D.N.Y. 2006) (internal citations omitted).

Aluf has again failed to respond to this point, opting instead to submit arguments relating to the exhaustion doctrine — which is, of course, no defense to this claim.  Nonetheless, the Court must consider the merits of Plaintiff's claim despite Defendant's failure to oppose it.  It is undisputed that Microban presented Aluf with an invoice for approximately $800,000.  Aluf made no objection, then or now, to the invoice.  (*See* Def. Opp. 3 ("Aluf has offered to pay the $750,876 that Microban claims is outstanding[.]")).  What is more, Aluf made a partial payment on the account, evincing its "assent to the account stated." *White Diamond*, 436 F. Supp. 2d at 624 ("[P]artial payment ... [is] evidence of assent to the account stated" (citing, *inter alia*, *Itar-Tass Russian News Agency* v. *Russian Kurier, Inc.*, No. 95 Civ. 2144 (JGK), 1999 WL 58680, at *4 (S.D.N.Y. Feb. 4, 1999) (finding account stated where defendant failed to

object in a timely fashion and made partial payment))).  Because Aluf has failed

to object to the account, and went so far as to make partial payment on that

account, Microban is entitled to summary judgment on this claim.

### v.    Breach of Contract

To state a claim for breach of contract under New York law, a plaintiff

must show that (i) an agreement existed; (ii) the plaintiff adequately performed

the contract; (iii) breach of contract by the defendant; and (iv) damages.  *Harsco*

*Corp.* v. *Segui*, 91 F.3d 337, 348 (2d Cir. 1996).  Microban contends that Aluf

breached the provision of the Agreement requiring it to remit payment within 30

days.  (Pl. Br. 10).  The parties do not dispute that they had an agreement, or

that Aluf did not remit payment in full within 30 days, and in fact, still owes

Microban $750,876.

Defendant does not specifically address Plaintiff's breach of contract

arguments, but instead chooses to incant its defense to Plaintiff's trademark

infringement claim, *viz.*, the exhaustion doctrine.  (Def. Opp. 11-12).  The Court

has already found this doctrine to be inapplicable on this record; even were it

applicable, however, it would be no response to Plaintiff's breach of contract

claims.

Next, Aluf raises a series of what the Court construes to be affirmative

defenses to the breach of contract claim.  (Def. Opp. 6-12).  Aluf first contends

that Microban breached the implied covenant of good faith and fair dealing that

inheres in every contract under New York law.  Specifically, the argument

proceeds, it was "at the very least bad faith" for Microban to deliver product on

39

July 30, 2013, after the Agreement had terminated, and "now claim that the defendant cannot use the Microban name and/or trademark in selling Aluf products containing the genuine Microban product that it purchased from Microban, as Aluf has been doing for the past seven years." (Def. Opp. 7).[21]  To the extent Aluf is arguing that Microban breached the implied covenant of good faith and fair dealing by delivering a product after the Agreement had expired, such an action was consistent with Microban's obligations under the Agreement, and "the implied covenant of good faith and fair dealing cannot be used to add to a party's substantive obligations or to contradict express terms of the agreement." *Higgs* v. *Columbia Univ.*, No. 05 Civ. 2642 (DF), 2009 WL 77880, at *12 (S.D.N.Y. Jan. 6, 2009).

Aluf has introduced no evidence concerning Microban's purported bad faith, beyond the fact that Microban will not accede to Aluf's demands that it permit Aluf to use the Microban Marks indefinitely.  (*See* Def. Opp. 7-8 ("It is disingenuous for the plaintiff to now seek an injunction from this Court to prevent Aluf from using Microban's name and trademark on genuine Microban goods which were manufactured for Aluf and sold to it by Microban for the very purpose of manufacturing plastic bags and liners.")).  In point of fact, the Agreement did not include a provision allowing Aluf to continue to use the Microban Marks after the Agreement terminated, or providing for a sell-off period.  More importantly, for the reasons discussed throughout this Opinion,

---

[21]   Aluf has never argued before this Court that the parties, as evidenced by their course of conduct, modified the Agreement in any way, and the Court therefore does not consider the issue.

Aluf has no legal right to use the Microban Marks after the termination of the Agreement, and its continued use infringes upon those Marks. Microban's enforcement of the rights it retained under the Agreement simply cannot constitute a breach of the implied covenant of good faith and fair dealing.

Second, Aluf argues that Microban breached the Agreement by "interfering with Aluf's sale of product" by way of "threatening various lawsuits." (Def. Opp. 10-11). First, the Agreement contained no provision requiring the parties to refrain from initiating legal actions against each other; there is simply no argument to be made that Microban breached the Agreement. There is likewise no evidence that Microban interfered with Aluf's sales, despite the former's strenuous (yet understandable) efforts to protect its Marks. (*See* Pl. Reply 2-3 n.3). That is, Microban attempted to negotiate with Aluf for several months over Aluf's continued, unauthorized use of the Microban Marks; when that failed, Microban asked Aluf to cease using the Marks; when that failed, Microban threatened to sue Aluf unless it stopped using the Marks; when that failed, Microban brought a lawsuit against Aluf; when that failed, Microban moved for summary judgment in that lawsuit. In fact, Aluf concedes that it has never removed the Microban Marks from its website, marketing materials, or product packaging. (Pl. 56.1 ¶ 39; Def. 56.1 Response (failing to respond to ¶ 39)).

Aluf's only evidence of any harm to it lies in its Chief Executive Officer's declaration — contradicted by the procedural history just described — that "Microban has made it almost impossible for Aluf to promote the sale of Aluf's

plastic bag products ... by threatening and then actually commencing this trademark infringement action against Aluf." (Rosenberg Decl. ¶ 19). *See generally Kerzer* v. *Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) ("[c]onclusory allegations, conjecture, and speculation are insufficient to create a genuine issue of fact." (citing *D'Amico* v. *City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998))). Defendant has offered no legally cognizable reason why Microban's decision to initiate this — not merely meritorious, but also successful — lawsuit can serve in any way as a defense to a breach of contract claim.[22]

Third, Aluf alleges that the "take or pay" provision is an illegal penalty. (Def. Br. 8-9). Microban responds that Aluf does not have standing to challenge this provision because it was not injured thereby (Pl. Reply 4); but the Court need not reach this argument because it is clear that, as a matter of law, the provision was not an illegal penalty.

Contracting parties commonly determine in advance the amount of damages due in the event of a future breach of an agreement by including a liquidated damages clause; such a provision is enforceable if it "is intended by the parties to operate in lieu of performance," but not "if such a clause is intended to operate as a means to compel performance." *Brecher* v. *Laikin*, 430 F. Supp. 103, 106 (S.D.N.Y. 1977) (internal citations omitted); *see also United*

---

[22]   Aluf contends that it is entitled to deduct from the sum owed to Microban what it deems to be "the difference between the amount and the value of a generic anti-microbial product without Microban's name and trademark." (Def. Opp. 10). It is not. Under N.Y. U.C.C. § 2-217, "[t]he buyer on notifying the seller of his intention to do so may deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due under the same contract." For the reasons discussed throughout, Microban did not breach the Agreement, and Aluf has no legal right to use the Microban Marks post-termination.

*Air Lines, Inc.* v. *Austin Travel Corp.*, 867 F.2d 737, 740 (2d Cir. 1989) (same);
*see generally 4 Third Avenue Leasehold, LLC* v. *Permanent Mission of United
Arab Emirates to United Nations*, 133 F. App'x 768, 769-70 (2d Cir. 2005)
(summary order) ("The New York Court of Appeals has recently cautioned courts
against interfering with liquidated damages provisions." (internal citation
omitted)).  A liquidated damages provision will be enforced if (i) "the liquidated
amount is a reasonable estimate of potential damages, that is, not plainly or
grossly disproportionate to the possible loss"; and (ii) "the estimated actual
damages are difficult to determine, or are not readily ascertainable."  *Leasing
Service Corp.* v. *Justice*, 673 F.2d 70, 73 (2d Cir. 1982).

Here, the Agreement required a "take," or minimum purchase, of
$800,000, and a "pay," or liquidated damages provision, of $500,000.  (Compl.
Ex. A § 9, as amended by § 2(b) of the Third Amendment).  The Second Circuit
has previously found a liquidated damages provision consisting of 80% of the
purchase amount to be enforceable; it follows that a liquidated damages
provision consisting of 62.5% is not "plainly disproportionate to the possible
loss." *United Air Lines, Inc.*, 867 F.2d at 740.  Moreover, the parties here
specifically agreed to such a provision after jointly reciting "the difficulty of
ascertaining actual damages in the event of [] a breach."  (Compl. Ex. A § 10).
Importantly, Aluf has introduced no evidence to the contrary.

"The utility of liquidated damages clauses is manifest in those cases
where calculation of the amount of actual loss is difficult, if not impossible; in
such case, the parties may agree in advance of the breach or default as to the

43

amount of damages to be paid thereupon, rather than requiring proof and an assessment thereof in some future proceeding." *LeRoy* v. *Sayers,* 635 N.Y.S.2d 217, 222 (1st Dep't 1995).  The liquidated damages provision, which Aluf chose never to exercise, is not an illegal penalty.  Aluf has failed to offer a valid defense to Microban's breach of contract claim, nor has it demonstrated that Microban breached the Agreement.

For all of these reasons, Microban is entitled to recover the amount it is owed on its breach of contract claim.

### vi.  Pre- and Post-Judgment Interest

Relatedly, Microban requests pre-judgment interest calculated from when payment for each of the shipments of Microban Compound became past due, at a rate of 9% per year.  (Pl. Br. 10 (citing N.Y. C.P.L.R. §§ 5001, 5004)).  Microban also requests post-judgment interest from the date judgment is entered.  (*Id.*).  Aluf does not contest the imposition of either pre- or post-judgment interest.

The Court finds, in its discretion, that Microban is entitled to pre-judgment interest calculated from the dates upon which its causes of action accrued, and post-judgment interest calculated from the date of judgment, at the statutory rate.  *Briarpatch Ltd., L.P.* v. *Geisler Roberdeau, Inc.*, 513 F. Supp. 2d 1, 5 (S.D.N.Y. 2007) (noting that pre-judgment interest is calculated "from the earliest ascertainable date on which the cause of action existed" through to the date of judgment" (internal quotation marks and citation omitted)); *Fendi Adele S.R.L.* v. *Burlington Coat Factory Warehouse Corp.*, 689 F. Supp. 2d 585,

614, 617 (S.D.N.Y. 2010) (noting that "this Court has wide discretion in selecting an appropriate rate of prejudgment interest to be applied," and referencing cases of willful infringement in which 9% pre-judgment interest was applied).

Microban contends additionally that it is entitled to late fees in the amount of 1.5% per month, as referenced in each invoice.  Aluf protests that "[i]nserting [such a penalty charge] in microscopic fine print on Microban's invoice does not mean Aluf agreed to it or is required to pay for it." (Def. Opp. 12).  "The decision whether to grant prejudgment interest and the rate used if such interest is granted are matters confided to the district court's broad discretion." *Endico Potatoes, Inc.* v. *CIT Group/Factoring, Inc.*, 67 F.3d 1063, 1071 (2d Cir. 1995) (internal quotation marks and citation omitted).  "New York law is unambiguous that notice of a finance charge on monthly invoices alone does not evidence agreement to the finance charge and entitle plaintiff to interest at the contract rate.  In order to prevail at a rate higher than the statutory 9% per annum, the contract itself must clearly specify the rate to be charged." *Gates Rubber Co.* v. *Vehicle Parts Warehouse Corp.*, 952 F. Supp. 132, 133 (E.D.N.Y. 1996) (collecting cases); *see also Oy Saimaa Lines Logistics Ltd.* v. *Mozaica-New York, Inc.*, 193 F.R.D. 87, 90 (E.D.N.Y. 2000) (same); *Haun Welding Supply, Inc.* v. *National Union Fire Ins.*, 636 N.Y.S.2d 512 (4th Dep't 1995) (awarding prejudgment interest at the statutory rate of 9%, notwithstanding invoices stating that a finance charge of 1.5% per month would

45

be charged on all past due accounts).[23]  The Court sees no reason to impose pre-judgment interest beyond the statutory interest rate.  Accordingly, Plaintiff's motion in this respect is denied.

## B.     Plaintiff's Motion for a Permanent Injunction

### 1.     Applicable Law

In addition to moving for summary judgment on its claims, Microban has moved under the Lanham Act for a permanent injunction enjoining Aluf from "improperly using the Microban Marks in the advertising and marketing of Aluf's trash bags," specifically, from using the Microban Marks as a co-brand. (Pl. Br. 20-24).  Aluf dedicates its opposition papers to arguing why preliminary injunctive relief should not be granted.  (Def. Opp. 18-19).  The Court construes Aluf's arguments as applying to a permanent injunction, which is the relief Microban seeks.

Pursuant to 15 U.S.C. § 1116, district courts have jurisdiction to enter injunctive relief in trademark infringement actions "according to the principles of equity and upon such terms as the court may deem reasonable."  15 U.S.C. § 1116(a).  Indeed, in most cases, "[s]uch an injunction is the usual and standard remedy once trademark infringement has been found."  *Fresh Del*

---

[23]     The cases Microban cites involve only the award of monthly fees under the Perishable Agricultural Commodities Act of 1930 ("PACA"), *Argi Exotic Trading, Inc.* v. *New Man Designed Sys., Ltd.*, No. 07 Civ. 49 (NG) (MDG), 2008 WL 2397565, at *3 (E.D.N.Y. June 12, 2008), or the imposition of attorney's fees pursuant to a PACA claim, *Coosemans Specialties, Inc.* v. *Gargiulo*, 485 F.3d 701, 708 (2d Cir. 2007).  (*See* Pl. Reply 1 n.2). Microban has not cited to any case in which a court awarded *both* the monthly late fee and the statutory pre-judgment interest rate; accordingly, the Court chooses only to award the statutory rate.

*Monte Produce, Inc.* v. *Del Monte Produce Co.*, 933 F. Supp. 2d 655, 660

(S.D.N.Y. 2013) (internal quotation marks and citation omitted).

In the Second Circuit, when a party seeks injunctive relief in an action

under the Lanham Act, courts apply the four-factor test enunciated by the

Supreme Court in *eBay Inc.* v. *MercExchange, LLC*, 547 U.S. 388, 390 (2006).

*Audemars Piguet Holding S.A.* v. *Swiss Watch Intern., Inc.*, No. 12 Civ. 5423

(HB), 2014 WL 47465, at *18 (S.D.N.Y. Jan. 6, 2014).  Although the Second

Circuit has not explicitly extended the *eBay* test to trademark actions, the

Court stated in *Salinger* v. *Colting*, where it extended the *eBay* test to copyright

infringement cases, that it saw "no reason [why] *eBay* would not apply with

equal force to an injunction in *any* type of case."  607 F.3d 68, 78 n.7 (2d Cir.

2010) (emphasis in original).  "In light of *Salinger*, district courts in this Circuit

have extended *eBay* to trademark actions as well."  *Laboratorios Rivas, SRL* v.

*Ugly & Beauty, Inc.*, No. 11 Civ. 5980 (RA) (JLC), 2013 WL 5977440, at *11 &

n.11 (S.D.N.Y. Nov. 12, 2013), *rep. and rec. adopted*, 2014 WL 112397 (S.D.N.Y.

Jan. 8, 2014).

The *eBay* test requires that "[a]fter succeeding on the merits, a plaintiff

seeking a permanent injunction must establish [i] that it has suffered an

irreparable injury; [ii] that remedies available at law, such as monetary

damages, are inadequate to compensate for that injury; [iii] that, considering

the balance of hardships between the plaintiff and defendant, a remedy in

equity is warranted; and [iv] that the public interest would not be disserved by a

permanent injunction.'" *Audemars Piguet Holding S.A.*, 2014 WL 47465, at *18 (quoting *eBay*, 547 U.S. at 388).

### 2.   Discussion

#### a.   Plaintiff Has Suffered an Irreparable Injury

The Second Circuit has not decided whether the previously-enforced presumption of irreparable harm in trademark infringement actions should still be applied in light of *eBay* and *Salinger*. *U.S. Polo Ass'n, Inc.* v. *PRL USA Holdings, Inc.*, 511 F. App'x 81, 85 (2d Cir. 2013) (summary order) ("We need not here decide whether a presumption of irreparable harm from trademark infringement can apply in light of [*eBay* and *Salinger*], because no such presumption was applied here" (internal citations omitted)).  The Second Circuit's decision in *Salinger*, however, suggests that this presumption should not continue.  In *Salinger*, the Second Circuit indicated that "*eBay*'s central lesson is that, unless Congress intended a 'major departure from the long tradition of equity practice,' a court deciding whether to issue an injunction must not adopt 'categorical' or 'general' rules or presume that a party has met an element of the injunction standard."  607 F.3d at 77-80 & n.7 (quoting *eBay*, 547 U.S. at 391-94).

The Court need not decide whether the presumption continues today because Plaintiff has demonstrated irreparable harm.  Courts have found irreparable harm to exist in situations where there is a likelihood of confusion between the marks, and where the reputation and goodwill cultivated by the party seeking the injunction would be out of the party's control because of the

infringement.  *See Audemars Piguet Holdings S.A.*, 2014 WL 47465, at *19 ("However, in light of the likelihood of confusion between the Royal Oak watch and Defendants' Trimix watches, without a permanent injunction, the reputation and goodwill cultivated by [the senior brand] would be out of its hands." (internal citation omitted)).  Aluf's only response is to declare, without more, "[t]here is no presumption of irreparable injury here and none has been shown."  (Def. Opp. 19).  On the contrary, having already established that Aluf's continued use of the Microban Marks is likely to cause consumer confusion, and where the potential for damage to Microban's reputation and goodwill is out of its control, Microban has also established that it would suffer an irreparable injury should injunctive relief not issue.

### b.    Plaintiff Has No Adequate Remedy at Law

"The second *eBay* factor, no adequate remedy at law, is satisfied where the record contains no assurance against defendant's continued violation of Plaintiff's trademark."  *Laboratorios Rivas, SRL*, 2013 WL 5977440, at *11 (internal quotation marks and citation omitted); *see also Register.com, Inc.*, 356 F.3d at 404 (noting that in cases where consumer confusion leads to damage to reputation, monetary damages are difficult to establish and are unlikely to present an adequate remedy at law).  There is ample evidence in the record that, absent an injunction, Aluf will continue to infringe the Microban Marks.  Aluf was advised on numerous occasions to cease and desist its infringing activity, but chose to ignore the warnings.  Moreover, Aluf has made plain its intention to continue to use the Microban Marks in precisely the same way it did during

the Agreement should injunctive relief not issue.  (*See* Def. Pre-Mot. Letter at 2

("Aluf has offered to pay Microban most of the amount claimed if Microban

stops threatening to interfere *with Aluf's use of the Microban name until it has*

*sold off the Microban product* it legitimately purchased directly from Microban."

(emphasis added)); Rosenberg Decl. ¶ 24 (estimating that it will take two to

three years to sell its remaining inventory)).

 Further, the loss of reputation and goodwill to Microban's brand is

unknown.  This, too, demonstrates the absence of an adequate remedy at law.

*Rolex Watch U.S.A., Inc.* v. *City Styles 313, LLC*, No. 12 Civ. 4754 (AJN), 2012

WL 5992102, at *5 (S.D.N.Y. Nov. 29, 2012) ("[T]here are no adequate remedies

at law because the permanent harm to Plaintiff's reputation cannot be

adequately monetized."); *Car-Freshener Corp.* v. *Excellent Deals, Inc.*, No. 10 Civ.

1391 (ENV), 2011 WL 3846520, at *4 (E.D.N.Y. Aug. 11, 2011) ("As in many

trademark cases, plaintiffs lack an adequate remedy at law.  Plaintiffs stand to

lose their accumulated good will and reputation — losses that are not easily

remedied by monetary damages." (internal citation omitted)).  Aluf does nothing

to allay the Court's concerns in this regard.  The Court agrees with Microban

that its inability to control its Marks for a period of years, coupled with the

threatened diminution of reputation and goodwill, as well as Aluf's avowed

intention to continue infringing, demonstrates that it has no adequate remedy

at law.

### c.    The Equities Weigh in Microban's Favor

The balance of equities also weighs in Microban's favor.  Microban alleges
that it derives substantial revenue from manufacturing the Microban
Compounds and then licensing the use of the Microban Marks to various
sellers.  (Pl. 56.1 ¶¶ 5-11).  Accordingly, allowing Aluf to misappropriate
Microban's Marks would indeed "undermine Microban's business, and create a
windfall to Aluf."  (Pl. Br. 23).  Aluf does not specifically address this factor
beyond stating, "Plaintiff's other minor point [] using buzz words for an
injunction, 'The Balance of the Hardships,' is pure fantasy."  (Def. Opp. 20).
Aluf goes on to declare, without record support, that Microban's business would
not be undermined, and Aluf would not receive a windfall.  (*Id.*).  Such
conclusory allegations are insufficient to carry the day, and the Court has
instead combed the record for Aluf's allegations of hardship that could possibly
tip in its favor.

Aluf has previously represented, albeit without record support, that it
would be very difficult, if not impossible, to sell its remaining inventory of trash
bags without using the Microban Marks.  (*See* Def. Opp. 19-20 (alleging that
"Aluf [is] stuck with at least $1.5 million worth of Microban product that *it
would be unable to sell*" (emphasis added)).  The Court is not persuaded.  First,
Aluf is not prohibited from using the Microban name, but is only prohibited
from using that name to co-brand its trash bags, as discussed *supra*.[24]  Second

---

[24]    There is considerable daylight between the stated positions of Aluf's counsel and its
President and Chief Executive Officer, Susan Rosenberg.  Aluf's counsel contends that it
has an "absolute right" to use the Microban Marks in precisely the way it is doing now
(Def. Pre-Mot. Letter at 2), yet Rosenberg avers that Aluf would be "perfectly willing to

and more importantly, Aluf chose to "take" rather than "pay," and bore the risk that it might not be able to sell off its inventory prior to the Agreement's termination.  (Pl. Br. 23).  The fact that Aluf may have made, in retrospect, an infelicitous business decision does not permit it now to infringe upon Microban's Marks out of some misplaced sense of fairness.  The balance of the hardships tips decidedly in Plaintiff's favor, with a specifically tailored injunction directed towards preventing Aluf from continuing its willful infringement.

### d. The Public Interest Would Not Be Disserved by a Permanent Injunction

Finally, the public interest would not be disserved by a permanent injunction.  "The Second Circuit has long held that there is a 'strong interest in preventing public confusion.'" *Juicy Couture, Inc.* v. *Bella Int'l Ltd.*, 930 F. Supp. 2d 489, 505 (S.D.N.Y. 2013) (citing *ProFitness Phys. Therapy Ctr.* v. *Pro-Fit Ortho. and Sports Phys. Therapy P.C.*, 314 F.3d 62, 68 (2d Cir. 2002)).  In response, Aluf denounces Microban's arguments as "frivolous," and states, without more, that "[t]here is no public interest in this private dispute.  There is no confusion as to what Microban product is being sold under Microban's name."  (Def. Opp. 20-21).

---

agree to reasonable language to be used to make it clear to any consumer and/or purchaser of Aluf's products that the product is *not* manufactured by Microban but Aluf; that Microban and Aluf have no current business relationship; that Microban is not responsible for Aluf's product other than to the extent that the Microban product sold to Aluf might be defective."  (Rosenberg Decl. ¶ 23 (emphasis in original)).  If this is in fact true, it is surprising that Aluf did not take Microban up on its reasonable request that Aluf stop using the Microban Marks to co-brand its trash bags, but instead persisted with this costly summary judgment motion.  Either way, if the Rosenberg Declaration is to be believed, Aluf should be neither surprised nor disappointed that the Court has, largely, awarded such injunctive relief.

Aluf is wrong.  The Court has already found Aluf's infringement to result in consumer confusion; accordingly, the public interest would not be disserved by the issuance of a permanent injunction.[25]  Microban is therefore entitled to a permanent injunction, barring Aluf from using the Microban Marks to co-brand its trash bags.[26]

## C.    Plaintiff's Motion for Attorney's Fees and Costs

The Lanham Act provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party."  15 U.S.C. § 1117(a); *Mister Softee of Brooklyn, Inc.* v. *Boula Vending Inc.*, 484 F. App'x 623, 624 (2d Cir. 2012) (summary order) ("Under the Lanham Act … the court in exceptional cases may award reasonable attorney fees." (collecting cases)).[27]  "The decision

---

[25]    Aluf contends that the Court should not "consider an injunction" absent a "hearing where evidence can be heard as to alleged consumer confusion, etc." (Def. Opp. 19; *see also id.* at 15).  Once again, Aluf is incorrect.  "Although it is necessary to prove that the buying public was actually deceived in order to recover damages under [§] 43(a) of the Lanham Act," Microban has forgone statutory damages on this basis.  *Warner Bros., Inc.*, 658 F.2d at 79 (internal citation omitted).  Where, as here, only injunctive relief is sought, a plaintiff need only show "a likelihood of confusion or deception."  *Id.* (internal quotation marks and citation omitted); *see also id.* ("Here, since equitable relief is sought, only the likelihood of confusion need be shown, and not proof of actual confusion[.]").

[26]    Aluf asks the Court to impose upon Microban a substantial bond pursuant to Federal Rule of Civil Procedure 65(c).  (Def. Opp. 19-20).  This rule applies by its terms to preliminary, not permanent, injunctions.  *See* Fed. R. Civ. P. 65(c) ("The court may issue a *preliminary injunction or a temporary restraining order* only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." (emphasis added)).  For this reason, the Court denies Aluf's request.

[27]    The fact that Microban has elected to forgo the damages to which it is entitled under the Lanham Act does not foreclose recovery of attorney's fees.  *Cf. Audi AG* v. *D'Amato*, 469 F.3d 534, 550 (6th Cir. 2006) (upholding award of attorney's fees to plaintiff who obtained injunctive relief but not damages); *cf. Bandag, Inc.* v. *Al Bolser's Tire Stores*, 750 F.2d 903, 919 (Fed. Cir. 1984) (concluding that an award of damages was not necessary to support an award of attorney's fees, and that a plaintiff who obtains injunctive relief but not damages may nonetheless be entitled to fees).  There can be, after all, no credible dispute that Microban was a prevailing party in this litigation. *See Buckhannon Bd. & Care Home, Inc.* v. *W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 605 (2001)

whether or not to award such fees [] rests within the broad discretion of the district judge." *George Basch Co., Inc.* v. *Blue Coral, Inc.*, 968 F.2d 1532, 1543 (2d Cir. 1992) (internal citation omitted). Microban has sought attorney's fees and costs incurred in bringing the instant litigation. The Court will exercise its discretion to award such costs and fees.

The Second Circuit has held that "a finding of willfulness, fraud, or bad faith is a 'prerequisite' to finding a case 'sufficiently exceptional to warrant an award of fees' under section 1117(a)." *Mister Softee of Brooklyn, Inc.*, 484 F. App'x at 624 (quoting *Louis Vuitton Malletier S.A.* v. *LY USA, Inc.*, 676 F.3d 83, 108-09 (2d Cir. 2012)); *accord Faberware Licensing Co.* v. *Meyer Mktg. Co.*, 428 F. App'x 97, 99 (2d Cir. 2011) (summary order) (citing *Universal City Studios, Inc.* v. *Nintendo Co.*, 797 F.2d 70, 77 (2d Cir. 1986)).[28] Even then, a finding of bad faith does not automatically require an award of attorney's fees under the Lanham Act. *See Mister Softee of Brooklyn, Inc.*, 484 F. App'x at 624 (rejecting argument that a finding of willful infringement automatically required an award

---

(concluding that, to qualify as a prevailing party, a litigant must achieve a "judicially sanctioned change in the legal relationship of the parties").

[28] The Supreme Court recently had occasion to analyze Section 285 of the Patent Act, which similarly provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. In *Octane Fitness, LLC* v. *Icon Health & Fitness, Inc.*, No. 12-1184, — S. Ct. —, 2014 WL 1672251, at *5 (Apr. 29, 2014), the Court held "that an 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." The Court further noted that "[u]nder the standard announced today, a district court may award fees in the rare case in which a party's unreasonable conduct — while not necessarily independently sanctionable — is nonetheless so 'exceptional' as to justify an award of fees." *Id.* at *6; *see also id.* ("[A] case presenting either subjective bad faith or exceptionally meritless claims may sufficiently set itself apart from mine-run cases to warrant a fee award."). This analysis, while not specifically applicable to Lanham Act cases, dovetails noticeably with the Second Circuit cases discussed in the text.

of attorneys' fees in plaintiffs' favor).  Instead, courts frequently look to whether the claims raised by either side were interposed for an "improper purpose." *Multivideo Labs, Inc.* v. *Intel Corp.*, No. 99 Civ. 3908 (DLC), 2000 WL 502866, at *2 (S.D.N.Y. Apr. 27, 2000) (considering whether "there is some evidence that the plaintiff filed the action for an improper purpose" (collecting cases)); *see also Mennen Co.* v. *Gillette Co.*, 565 F. Supp. 648, 657 (S.D.N.Y. 1983) (awarding attorney's fees where "[t]here is a substantial overtone in this case to warrant an inference that this suit was initiated as a competitive ploy.  As such it carries necessary damage to the defendant when plaintiff's claims are found, as they are here, to have no real substance."), *aff'd*, 742 F.2d 1437 (2d Cir. 1984).

An improper purpose may also be inferred in cases in which a party's conduct or arguments are sufficiently devoid of legal merit that one could only conclude that they were advanced with an improper motive.  *See, e.g.*, *Gameologist Grp., LLC* v. *Scientific Games Int'l, Inc.*, No. 09 Civ. 6261 (JGK), 2012 WL 1446922, at *2 (S.D.N.Y. Apr. 26, 2012) ("[W]hen 'courts have found bad faith based on the meritlessness of a plaintiff's claims, [t]he circumstances were generally such … that a court could draw no inference other than that the actions had been brought for improper purposes.'" (quoting *Farberware Licensing Co.* v. *Meyer Mktg. Co.*, No. 09 Civ. 2570 (HB), 2009 WL 5173787, at *2 (S.D.N.Y. Dec. 30, 2009), *aff'd*, 428 F. App'x 97 (2d Cir. 2011) (summary order) (internal quotation marks omitted))); *see also C=Holdings B.V.*, 2013 WL 6987165, at *19 (awarding attorney's fees for defendant's "willful infringement," "outrageously deceptive litigation tactics," and "complete lack of respect for the

55

judicial process"); *cf. Gordon & Breach Sci. Publishers S.A.* v. *American Inst. of Physics*, 166 F.3d 438, 439 (2d Cir. 1999) (per curiam) ("The present litigation may not have been strong enough on the merits but raised enough nonfrivolous claims to preclude the awarding of fees.").

There is abundant evidence in the record that Aluf's infringement of Microban's Marks for the past 10 months was more than willful and, indeed, more than indicative of bad faith. It was strategic: Aluf, with full knowledge of the provisions of (including the amendments to) the Agreement it had negotiated, elected to "take" rather than to "pay" in May 2013. Thereafter, it made a business decision to hijack Microban's Marks in order to extort from Microban an indefinite extension of the licensing component of the Agreement, without any corresponding extension of the supply component and, perhaps more importantly, without any payment of any type to Microban for the extension. Aluf evinced awareness, in September 2013, that its use of the Microban Marks was unauthorized and inappropriate, but it continues to persist with that use, despite multiple cease and desist letters. Perhaps most egregiously, Aluf fomented the instant litigation, forcing Microban to come to Court to obtain that to which it is indisputably entitled: the $750,876 in arrearages and the control over its own Marks.[29] Aluf's claims in the instant litigation have bordered on the specious, and evidence little more than an effort

---

[29]   Even here, Aluf has suggested that this is a claim for breach of contract that Microban has, improperly, sought to elevate to one for trademark infringement. This suggestion would have more traction if Aluf's transgressions were limited to its failure to pay for the Microban Compounds it purchased. By coupling that conduct with continued, improper use of the Microban Marks, it is Aluf who has required the Court to consider the Lanham Act.

to delay its day of reckoning.  That day has come — and with it, the imposition of attorney's fees in favor of Microban for the untenable business and litigation positions Aluf has advanced before and during this lawsuit.

## CONCLUSION

For the reasons discussed herein, Plaintiff's motion for summary judgment is GRANTED.  The Clerk of Court is directed to terminate Docket Entry 20.

Plaintiff is entitled to $750,876 in damages.  Plaintiff is further entitled to pre-judgment interest, compounding annually at the statutory rate of 9%, and accruing on the date each invoice became past-due.  Plaintiff is also entitled to post-judgment interest, compounding annually at the statutory rate of 9%, and accruing on the date of judgment.  It is hereby ORDERED that Plaintiff shall submit a proposed Order to the Court setting forth the above-detailed damages, including the dates from which pre-judgment interest shall be awarded, by May 30, 2014.

Plaintiff's motion for a permanent injunction is also GRANTED.  Aluf is permanently enjoined from using the Microban Marks to co-brand its products.  It is further ORDERED that by May 30, 2014, Plaintiff shall submit a proposed Order to the Court setting forth the precise terms of the permanent injunction discussed herein.

Plaintiff's motion for attorney's fees is GRANTED.  It is further ORDERED that, by no later than May 30, 2014, Microban shall submit a fee application to the Court, including a sworn declaration providing each attorney's background,

experience, and billing rate at the time the work was expended, as well as copies of the attorneys' time sheets.  Aluf may submit papers opposing the amount of fees requested, but not the imposition of fees themselves, no later than June 13, 2014.

It is further ORDERED that Defendant shall inform the Court, in writing, within 14 days as to whether it intends to proceed with its counterclaims.

SO ORDERED.

Dated: May 8, 2014
     New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge